IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 2:21-cr-101-MHT-JTA |
| | ) | (WO) |
| JOHNNIE LEEANOZG DAVIS | ) | |

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This cause is before the Court on Defendant Johnnie Davis' Motion to Suppress Google Search Warrants[1] filed on April 20, 2022.  (Doc. No. 110.)  Davis contends that the search warrant which led to his arrest lacked the specificity required by the Fourth Amendment, and that any evidence derived therefrom should be suppressed.

After due consideration of the parties' arguments, witness testimony and applicable law, the undersigned concludes that the motion to suppress is due to be DENIED.

## I.    FACTUAL BACKGROUND[2]

Nathan Faggert was the primary investigator into a string of twenty-six business robberies in Montgomery, Elmore, and Autauga Counties between July 20, 2014, and June

---

[1] Davis originally challenged two search warrants issued for information from Google on December 4, 2018, and March 9, 2020.  (*See* Doc. No. 110 at ¶ 10 (Google I Warrant) and ¶ 13 (Google II Warrant)).  He withdrew his challenge to the Google I Warrant.  (Doc. No. 135, Tr. at 3.)  Accordingly, the only warrant currently challenged is the Google II Warrant.

[2] This is the second Recommendation issued by the undersigned in this case.  The first addressed Davis' claim that, after arrest by *de facto* federal agents, he was deprived of his right to prompt presentment before a federal magistrate and his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).  (*See* Doc. No. 117.)  This Recommendation relies upon evidence presented during the first part of the evidentiary hearing conducted on February 10, 2022 (Doc. No. 113, Tr.) and the evidence presented on May 25, 2022 (Doc. No. 135, Tr.) when the hearing resumed.

5, 2017.[3]  (Doc. No. 113, Tr. at 53, 62.)  Between May 14, 2015, and June 5, 2017, nine carjackings took place where the vehicle carjacked was then used to commit the robberies. (*Id.* at 62.)  Based upon descriptions of the suspect and *modus operandi* of the robberies, Faggert believed the same person was responsible.  (*Id.* at 48-49.)  In 2017, he initiated an FBI investigation into thirty-five incidents which he believed were committed by the same suspect(s).  (*Id.* at 15, 62-63.)

On March 9, 2020, Faggert presented an application for a search and seizure geofence warrant[4] for review to United States Magistrate Judge Susan Russ Walker.  (Doc. No. 135, Tr. at 5.)  Faggert's affidavit in support of the warrant cited 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41 as authority to require Google to search the information described in Attachment A for evidence of violations of 18 U.S.C. § 1951 (Hobbs Act Robbery) and 18 U.S.C. § 2119 (Carjacking).  (Doc. No. 131-8 at ¶ 1.)[5] The affidavit described the capabilities of internet companies, specifically Google, to

---

[3]  At the time of his investigation, Faggert was a Sergeant with the Montgomery Police Department ("MPD") and task force officer with the Federal Bureau of Investigation ("FBI").  Faggert is no longer employed by MPD and now works for the Alabama Securities Commission.  (Doc. No. 113, Tr. at 13-14.)

[4]  "A 'geofence' is a perimeter set up around certain locations based on the GPS coordinates of the locations."  *United States v. Asghedom*, 992 F. Supp. 2d 1167, 1169 (N.D. Ala. 2014).  Google's data is acquired and stored through Location History, Web and App Activity ("WAA") and Google Location Accuracy ("GLA").  *See United States v. Chatrie*, ___ F. Supp. 3d ___, 2022 WL 628905, at *3 (E.D. Va. Mar. 3, 2022).  After law enforcement determines which anonymized devices are relevant to its investigation, it requests Google "to provide account subscriber information such as the Gmail address associated with the account and the first and last name entered by the user on the account."  *Id.* at 14.

[5]  The series of exhibits filed as Document Number 131 were admitted by the court during the suppression hearing and are for court use only.

access stored information relating to users of wireless devices, such as cellular telephones, who have provided basic personal information to the company.  Faggert stated that Google collects personal identifying information such as a user's name, address, telephone number, or alternative email addresses.  (*Id*. at ¶¶ 6-9.)  Google's ability to identify a particular user of its services, and to access their stored information "may provide crucial evidence of the 'who, what, why, when, where, and how' of the criminal conduct under investigation" and "show how, where, and when the account was accessed or used."  (*Id*. at ¶ 10.)  Google uses GPS data, cell site/cell tower information and Wi-Fi access points to collect and retain location data from mobile devices which use its Android operating system.  (*Id*. at ¶ at 12.)  Such "geographic and timeline information" developed from location data can "indicate the geographic location of the account user at a particular time," and may therefore aid investigators in developing inculpatory or exculpatory information of a particular user.  (*Id*. at ¶ 13.)

Faggert presented facts relating to possible violations of 18 U.S.C. §§ 1951 and 2119.  He described an armed vehicle theft and robbery at approximately 9:20 p.m. on January 23, 2020, and a business robbery in which the robber, armed with two handguns, used the same vehicle stolen approximately twenty minutes earlier.  (*Id*. at ¶¶ 15-16.)  Video surveillance showed the robber's escape routes from both crime scenes.  After abandoning the stolen car, the robber could be seen entering the passenger's side of an unknown sedan which then drove away.  (*Id*. at ¶ 17.)  Faggert closed his statement of probable cause with the premise that if the perpetrators of these offenses were in possession

of a cell phone with an Android operating system, Google is likely in possession of information that could lead to their identification.  (*Id*. at ¶ 18.)

Magistrate Judge Walker approved the geofence warrant which included Attachments A through E.  (Doc. No. 131-14.)  Attachment A stated that pursuant to the warrant, Google should search its "(1) GPS, WiFi or Bluetooth sourced location history data generated from devices that reported a location within the geographical region bounded by the following latitudinal and longitudinal coordinates, dates, and times ("Initial Search Parameters") and (2) Identifying information for Google Accounts associated with the responsive location history data" for the following six locations:

- Location 1 – Between 1/23/2020 at 2057 hours Central Time or 01/24/2020 at 0257 hours UTC[6] and 01/23/2020 at 2127 hours Central Time or 01/24/2020 at 0327 hours UTC located within the geographical region bounded by and within the geographical radius of 100 meters of (32.374861 -86.283346);

- Location 2 – Between 01/23/2020 at 2112 hours Central Time or 01/24/2020 at 0312 hours UTC and 01/23/2020 at 2142 hours Central Time or 01/24/2020 at 0342 hours UTC located within the geographical region bounded by and within the geographical radius of 100 meters of (32.358561, -86.233295);

- Location 3 – Between 01/23/2020 at 2106 hours Central Time or 01/24/2020 at 0306 hours UTC and 01/23/2020 at 2146 hours Central Time or 01/24/2020 at 0346 hours UTC located within the geographical region bounded by and within the geographical radius of 100 meters of (32.350394, -86.234718).

- Location 4 – Between 01/23/2020 at 2115 hours Central Time or 01/24/2020 at 0315 hours UTC and 01/23/2020 at 2130 hours Central Time or 01/24/2020 at 0330 hours UTC located within the geographical

---

[6] "UTC" is an abbreviation of Universal Time Coordinated, formerly known as Greenwich Mean Time ("GMT").

region bounded by and within the geographical radius of 40 meters of the following parameters of the polygon: 32.372675, -86.271282: 32.372730. – 86.270789; 32,365399, -86.271594: 32,365363, -86.270907. See attachment B for an accompanying map with the four corners within the polygon.

- Location 5 – Between 01/23/2020 at 2120 hours Central Time or 01/24/2020 at 0320 hours UTC and 01/23/2020 at 2135 hours Central Time or 01/24/2020 at 0335 hours UTC located within the geographical region bounded by and within the geographical radius of 40 meters of the following parameters of the polygon: 32.366405, -96.271754; 32.366260, -86.267463; 32.359608, -86.252915; 32.359753, -86.243559; 32.357451, -86.243280; 32.358158, -86.247250; 32.358448, -86.254309; 32.359572, -86.258322; 32.365335, -86.267914; 32.365372, -86.271905. See attachment C for an accompanying map with the corners within the polygon.

- Location 6 – Between 01/23/2020 at 2115 hours Central Time or 01/24/2020 at 0315 hours UTC and 01/23/2020 at 2145 hours Central Time or 01/24/2020 at 0345 hours UTC located within the geographical region bounded by and within the geographical radius of 40 meters of the following parameters of the polygon: 32.350627, -86.234595; 32.349204, -86.233319; 32.349204, -86.232192; 32.348877, -86.232192; 32.349036, -86.233539; 32.350609, -86.234880. See attachment D for an accompanying map with the corners within the polygon.

(Doc. No. 131-14 at 3-7.)[7]  As referenced, Attachments B through D depict aerial images

of the areas corresponding to Locations 4 through 6.  Attachment E listed the items to be

seized and searched through a three-step method as follows:

Google shall provide responsive data (as described in Attachment A) pursuant to the following process:

1. Google shall query location history data based on the Initial Search Parameters (as described in Attachment A).

_____

[7] The timespans for the requested search of each location are: (1) thirty minutes, (2) thirty minutes, (3) forty minutes, (4) fifteen minutes, (5) fifteen minutes, and (6) thirty minutes.

2. For each location point recorded within the Initial Search Parameters, Google shall produce anonymized information specifying the corresponding unique device ID, timestamp, coordinates, display radius, and data source, if available ("the Anonymized List").

3. Law enforcement shall review the Anonymized List to remove devices that are not relevant to the investigation, for example, devices that were not in the location for a sufficient period of time. If additional location information for a given device ID is needed in order to determine whether that device is relevant to the investigation, law enforcement may request that Google provide additional location coordinates for the Time Period that fall outside of the Target Location. These contextual location coordinates may assist law enforcement in identifying devices that were located outside the Target Location, were not within the Target Location for a long enough period of time, were moving through the Target Location in a manner inconsistent with the facts of the underlying case, or otherwise are not relevant to the investigation.

4. For those device IDs identified as relevant pursuant to the process described above, law enforcement may request that Google Provide identifying information, as defined in 18 U.S.C. § 2703(c)(2), for the Google Account associated with each identified device ID.

(*Id.* at 8.)

However, the evidence adduced at the hearing establishes that the authorization of the Google II Warrant was imperfect. Faggert testified he altered the signature page of the warrant by drawing a line through "B" for "Attachment B" (where the warrant identifies the person or describes the property to be seized), added an "E" and added his initials.[8] (Doc. No. 135, Tr. at 6.) Although it is unknown whether Magistrate Judge Walker approved Faggert's edits to the warrant, Faggert testified that he only made "changes to warrants or applications . . . in the presence of a judge," that it was his practice to "initial

---

[8] Faggert attributed the typographical error to the government paralegal who typed the warrant application. (*Id.* at 35-36.)

it in front of the presence of a judge" and that in the past, he "always made a change to a warrant or application . . . in front of a judge." (*Id*. at 7.)  Other copies of the signed warrant do not show this alteration,[9] including the one that was filed with the court on the date the warrant was signed.  (*Id*. at 6-7.)  Though Faggert cannot explain why an unedited copy of the warrant (without Attachments A through E) was filed with the court, he testified that Agent J. Berni, a former colleague at the FBI who served as an analyst on the case, checked agency records to verify that the edited version, with Attachments A through E, was served on Google.  (*Id*. at 7, 11-13, 17.)  Faggert testified that Magistrate Judge Walker approved the attachments that he served with the Google Warrant because a physical copy of each attachment was presented to her during the warrant review process.  (*Id*. at 25, 27-29, 31-32.)

In response to the Google II Warrant, on June 2, 2020, Google produced its step one returns in the form of Excel spreadsheets which identified devices by anonymous account numbers assigned by Google that did not correlate to a user's cell phone number.[10]  (*Id*. at 14-15, 19-20.)  Faggert testified that this first set of results could have included anyone within the specified geographical coordinates and timeframe who possessed a cellular device enabled with Google's location capabilities.  (*Id*. at 20.)  Consistent with its privacy protection protocols, Google's transmittal letter informed Faggert that

---

[9] (*See* Doc. No. 131-4 at 1; Doc. No. 131-9 at 1.)

[10] Faggert explained the Google data received in response to the warrant by stating, "I relied on [Agent] Berni's experience to do the analysis and I based my interpretation on his interpretation and his experience on the analysis of these returns." (*Id*. at 17.)

[t]he purpose of this state of the warrant process is for you to remove devices that do not appear to be relevant to your investigation (for example, devices that were not in the relevant location for a long enough period of time).

In many cases, reviewing additional location coordinates for a given device can assist in identifying devices that are not relevant to the investigation (for example, such contextual location data can help remove false positives).  To the extent you have identified devices for which you require additional location information, under stage 2 of your search warrant please email [address provided] (with the Google reference number in the Subject Line) and list the relevant Device ID(s) that require additional location information. . . . As stated in the Location History section . . . the Device ID (or device tag) is not a valid target identifier that can otherwise be used to search for information.  The Device ID is used only for distinguishing unique devices in a particular user's location history and cannot be mapped to an Android ID or an IMEI/MEID.

Finally, under stage 3 of your warrant, for the devices determined to be relevant, law enforcement may request identifying information in the same manner described above . . . , and Google may provide basic subscriber information (as defined in 18 U.S.C. § 2703(c)(2)) in response.  Pursuant to the Search Warrant, once identifying information is produced, additional location history cannot be provided without additional legal process.

(Doc. No. 131-10 at 3-4.)  Step two returns were produced by Google on June 9, 2020.

(*Id*. at 22-23.)  After analysis, Faggert made a step three request and Google provided the

step three information on June 15, 2020.  (*Id*. at 22-23.)  The step three information was

subscriber information for three Google users.  (*Id*. at 22-23.)  Of the three users in this

final set, Faggert determined that two were not relevant and then requested further

information on the third.  (*Id*. at 25.)  Google responded by providing identifying account

information for a Gmail account that did not belong to Davis.[11]  There is no evidence before

---

[11] According to the Government, the final Google account identified by Faggert at step three as relevant to the investigation was an account referred to as the "Yonna Gmail account" and connected to a person "who is not Mr. Davis."  (*Id*. at 51.)  The device associated with the Yonna Gmail account was present in the unknown sedan that the robber entered to depart the area on

the court that the Google II Warrant caused any device or data belonging to Davis to be searched.

Nonetheless, using information associated with that Gmail account and other investigative techniques, including searches of Alabama license plate databases, video surveillance, and local crime records, law enforcement identified Davis as a suspect.  (*Id.*; Doc. No. 1 at ¶¶ 11-13; Doc. No. 113 at 22-24.)  After additional carjackings and business robberies took place on October 30 and November 11, 2020, Faggert reviewed tracker data on a cell phone believed to belong to Davis.  (Doc. No. 113, Tr. at 53-54, 71-72.)  Sometime after midnight on November 12, 2020, Faggert and MPD Detective Joseph Favor began to prepare search warrants for two residences associated with Davis—one in Elmore County and one in Montgomery County.  (*Id.* at 73.)  Faggert obtained warrants for both residences and each were executed at 6:00 a.m. on the morning of November 12, 2020.  (*Id.* at 74-77.) He also obtained an arrest warrant for Davis from the Montgomery Municipal Court.  (*Id.* at 76.)  On November 12, 2020, MPD officers took Davis and another suspect into custody at the Montgomery County residence.  (*Id.* at 46-47.)

## II.    PROCEDURAL HISTORY

A federal grand jury returned a ten-count indictment against Davis on February 9, 2021.  (Doc. No. 4.)  The indictment charged Davis with two counts of carjacking in violation of 18 U.S.C. § 2119; five counts of brandishing a firearm in relation to a crime

---

January 23, 2020, after abandoning the stolen car.  (*Id.*)  In other words, the device which had the Yonna Gmail account open was located in the getaway car.

of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii); and three counts of Hobbs Act Robbery in violation of 18 U.S.C. § 1951.  (*Id*.)  Davis entered a plea of not guilty to all counts during his arraignment on April 20, 2021.  (Doc. No. 12.)  On December 1, 2021, Davis was charged in a superseding, fourteen-count indictment which alleged additional counts of carjacking and Hobbs Act Robbery, with two additional counts of brandishing a firearm in relation to a crime of violence.  (Doc. No. 62.)  Davis entered a plea of not guilty to all counts when arraigned on the superseding indictment on December 14, 2021.  (Doc. No. 70.)

On April 20, 2022, Davis filed a motion to suppress any and all evidence derived from the Google II Warrant.  (Doc. No. 110.)  The Government filed its response in opposition (Doc. No. 114) and Davis filed his reply thereto (Doc. No. 116).  During the evidentiary hearing conducted on May 25, 2022, the undersigned granted permission for Davis to file a supplemental brief on whether the warrant was validly issued when it was confirmed that a copy of the warrant served upon Google was not filed with the Clerk of Court.  (Doc. No. 135, Tr. at 41.)  Davis filed his Supplement to Motion to Suppress addressing that issue (Doc. No. 132), to which the Government responded (Doc. No. 136).

This matter is ripe for disposition.

### III.   DISCUSSION

A.  Davis' Motion to Suppress Evidence Derived from the Google II Warrant

Davis contends that because the Google II Warrant authorized "a search of every Google user who happened to be near certain locations on certain dates," it lacked the particularity required by the Fourth Amendment to the United States Constitution and that

evidence derived therefrom should be suppressed.  (Doc. No. 110 at ¶¶ 16, 22.)  He argues that geofence warrants are "not remotely particularized" and are designed "to search across many unknown user accounts and then identify specific accounts that law enforcement would like to search further."  (*Id*. at ¶¶ 25, 26.)  Davis also anticipated the Government's assertion of the *Leon* good faith exception and asserts that no objectively reasonable officer could rely on a geofence warrant because of the general and imprecise nature of such warrants.  (*Id*. at ¶¶ 28, 30.)

Davis also argues that the Google II Warrant was invalid because the version filed with the Clerk of Court was not the same version Faggert served upon Google, as it was not corrected to reflect Attachment E, rather than Attachment B, and was not filed with the relevant attachments.  (Doc. No. 132 at ¶ 10.)  Absent the correct description of the place to be searched and things to be seized, Davis asserts that the warrant was "invalid just as if no warrant existed."  (*Id*. at ¶ 11.)  Additionally, Davis states that the absence of a file stamp on the warrant Faggert served on Google indicates that it was altered after the official version was filed in this Court.  (*Id*. at ¶ 18.)  Finally, Davis argues that the invalidity of the warrant cannot be remedied under *Leon*.  (*Id*. at ¶ 19.)

The Government first responds that Davis lacks standing to challenge the sufficiency of the warrant.  (Doc. No. 114 at 6-7.)  It also submits two alternative arguments:  (1) that the warrant contained probable cause to search the geographical coordinates contained therein for cellular signals during the specified timeframe, and (2) should probable cause not be found, that law enforcement reasonably relied on the warrant in good faith such that any constitutional infirmity should not result in suppression.  (Doc.

No. 114 at 7-9, 9-11.)  In response to Davis' argument that the warrant was not valid because the version served on Google was not filed with the Court, the Government maintains that (1) testimony showed that Magistrate Judge Walker approved Faggert's edits to the warrant, and (2) there is no legal requirement that warrants be filed with the Clerk of Court despite the longstanding local practice of doing so.  (Doc. No. 136 at 2.)

Davis replies that he had a legitimate expectation of privacy in the area searched regardless of whether he had an expectation of privacy in the items seized and that a defendant's "standing" to challenge a search is not the relevant inquiry.  (Doc. No. 116 at ¶¶ 2-3.)  He submits that the question currently posed by the Supreme Court is whether a search "has infringed an interest of the defendant which the Fourth Amendment was designed to protect."  (*Id*. at ¶ 3 (quoting *Rakas v. Illinois*, 439 U.S. 138, 140 (1978)).

B.  Governing Legal Principles

1.  Fourth Amendment Protections

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  This means a warrant generally must be obtained to search a residence unless an exception applies.  *Kentucky v. King*, 563 U.S. 452, 459 (2011).  "The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested."  *United States v. Betancourt*, 734 F.2d 750, 754 (11th Cir. 1984) (citing *Zurcher v. Stanford Daily*, 436 U.S. 547, 558 (1978)).  "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts"—and

12

must be judged on the totality of the circumstances presented in each case.  *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

The burden of establishing that a search warrant is defective is upon the defendant. *United States v. Lockett*, 533 F. App'x 957 (11th Cir. 2013) (citation omitted) ("When a search is conducted pursuant to a warrant, the burden is on the defendant to show that the warrant is invalid.")  "Under what is known as the 'exclusionary rule,' evidence seized as a result of an illegal search may not be used by the government in a subsequent criminal prosecution."  *United States v. Martin*, 297 F.3d 1308, 1312 (11th Cir. 2002).  In *United States v. Leon,* 468 U.S. 897 (1984), the Supreme Court created a "good faith exception" to the exclusionary rule[12] where Fourth Amendment violations would otherwise prohibit the use of evidence seized during an unconstitutional search.  468 U.S. at 913.  The exception applies where evidence is obtained "by officers reasonably relying on a warrant issued by a detached and neutral magistrate," that is subsequently invalidated for lack of probable cause.  *Id*.  "[The] good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization," and in conducting this inquiry, a court may consider "all of the circumstances."  *Leon*, 468 U.S. at 922 n.23.  The Government bears

---

[12] The exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights" by prohibiting the use of illegally seized evidence in criminal prosecutions.  *United States v. Calandra*, 414 U.S. 338, 348 (1974).  The rule is designed to deter misconduct by law enforcement by banning evidence obtained in violation of the Fourth Amendment.  *United States v. Virden*, 488 F.3d 1317, 1322 (11th Cir. 2007) (citing *Nix v. Williams*, 467 U.S. 431, 442-43 (1984)).  The rule "has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion."  *Wong Sun v. United States*, 371 U.S. 471, 485 (1963).

the burden of demonstrating the applicability of the good faith exception.  *United States v. Robinson*, 336 F.3d 1293, 1297 (11th Cir. 2003) (citing *United States v. Travers*, 233 F.3d 1327, 1331 n.2 (11th Cir. 2000)).

2.  Fourth Amendment "Standing"[13]

The protections of the Fourth Amendment "extend to any thing or place with respect to which a person has a 'reasonable expectation of privacy[.]' "  *United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020) (quoting *California v. Ciraolo*, 476 U.S. 207, 211 (1986)).  "The Fourth Amendment's ultimate touchstone is reasonableness."  *Brigham City, Utah v. Stuart*, 547 U.S. 398, 398 (2006).  "The application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action."  *United States v. Gayden*, 977 F.3d 1146, 1151 (11th Cir. 2020) (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)).  Because privacy is personal, a party must demonstrate that their own privacy rights are at stake.  *Presley v. United States*, 895 F.3d 1284, 1289 (11th Cir. 2018) (citing *Lenz v. Wilburn,* 51 F.3d 1540, 1549 (11th Cir. 1999)).

---

[13]    The Eleventh Circuit has clarified that the "threshold issue of whether an individual has a reasonable expectation of privacy in the object of the challenged search" is known colloquially, but misleadingly, as "Fourth Amendment 'standing.' "  *United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020); *see also Byrd v. United States*, ___ U.S.___, 138 S. Ct. 1518, 1530 (2018) ("The concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search; but it should not be confused with Article III standing, which is jurisdictional and must be assessed before reaching the merits.").  The Eleventh Circuit has directed courts to "consider standing as part of the merits" when addressing Fourth Amendment claims.  *Presley v. United States*, 895 F.3d 1284, 1290 (11th Cir. 2018).

"[A] defendant must establish both a subjective expectation of privacy in the place searched as well as the objective reasonableness of that expectation." *United States v. Maxi*, 886 F.3d 1318, 1325 (11th Cir. 2018) (citing *Robinson*, 62 F.3d at 1328).

C.  Analysis of Davis' Motion to Suppress

Guidelines for geofence warrants have not been addressed by any authority binding on this Court.  In *Carpenter v. United States*, the United States Supreme Court held the acquisition of historical cell-site records[14] for a period of seven days is a search under the Fourth Amendment for which the government must obtain a warrant.  585 U.S. ___, 138 S. Ct. 2206, 2217-21 (2018); *United States v. Green*, 981 F.3d 945, 956 (11th Cir. 2020). However, as Chief Circuit Judge Pryor observed, *Carpenter* "made clear that [the Court] "d[id] not express a view on matters not before [it]."  *United States v. Trader*, 981 F.3d 961, 968 (11th Cir. 2020) (addressing whether defendant had a reasonable expectation of privacy in email addresses or internet protocol addresses).  This Court has similarly noted that because *Carpenter* "explicitly refused to answer whether one's 'reasonable expectation of privacy in the whole of his physical movements' extends to shorter periods of time or to other location tracking devices . . . Courts like this one are left to decide just how long is a piece of string."  *United States v. Howard*, 426 F. Supp. 3d 1247, 1254 (M.D. Ala. 2019) (internal citation omitted).  Hence, geofence warrants seeking information for the time periods contained in the Google II Warrant – all under forty-five minutes – are not

---

[14] Cell Site Location Information ("CSLI") is a time-stamped record generated when a cellular device connects to a radio antenna, or "cell site." *Carpenter v. United States*, 538 U.S. ___, 138 S. Ct. 2206, 2211 (2018).

covered by *Carpenter*.  The information sought by such warrants, is however, analogous to the historical location data considered in *Carpenter*.  As Davis acknowledged during the evidentiary hearing, this Court is in "uncharted territory" in light of the paucity of decisions in this Circuit, and nationwide, available to guide the court's evaluation of the Google II Warrant.  (Doc. No. 135, Tr. at 43.)

Davis urges the court to adopt the probable cause analysis set forth in *United States v. Chatrie*, ___ F. Supp. 3d ___, 2022 WL 628905 (E.D. Va. Mar. 3, 2022).[15]  (Doc. No. 110 at ¶ 19.)  On the other hand, the Government argues that probable cause exists and relies upon *In the Matter of the Search of Information That Is Stored at the Premises Controlled by Google LLC*, ___ F. Supp. 3d ___, 2021 WL 6196136 (D.D.C. Dec. 30, 2021), as support for its argument.[16]  (Doc. No. 114 at 8.)

---

[15] *Chatrie* reviewed a geofence warrant that led to the step three identification of a suspect seen on surveillance video using a cell phone when he entered the bank he was about to rob.  *Chatrie*, 2022 WL 628905 at *10, 16.  The court found the geofence warrant invalid because it "lacked any semblance of such particularized probable cause to search each of its nineteen targets, and the magistrate thus lacked a substantial basis to conclude that the requisite probable cause existed." *Id*. at *18.  However, because law enforcement consulted with counsel before applying for the geofence warrant, and no court had yet ruled that geofence warrants violated the Fourth Amendment, the court found the *Leon* good faith exception applied and denied the motion to suppress. *Id*. at *28.

[16] *In the Matter of the Search of Information That Is Stored At the Premises Controlled by Google LLC*, ___ F. Supp. 3d ___, 2021 WL 6196136 (D.D.C. Dec. 30, 2021), the magistrate judge in that case reasoned that the Fourth Amendment is satisfied where law enforcement shows (1) probable cause that a crime was committed; and (2) probable cause that the proposed search will uncover evidence of that crime.  *Premises Controlled by Google LLC*, 2021 WL 6196136 at *9 (citing *Gates*, 462 U.S. at 236).  Even though the court in that case cited a video showing unknown suspects using cell phones, which the court relied upon to find probable cause that a geofence warrant would uncover useful evidence, the court noted that because the "core inquiry . . . is probability, not certainty, . . . it is eminently reasonable to assume that criminals, like the rest of society, possess and use cell phones to go about their daily business."  *Id*. at *10.

But the dispute over whether the Google II Warrant satisfied the Fourth Amendment's probable cause requirement assumes that Davis has shown that he has a cognizable Fourth Amendment interest in the place searched under the Google II Warrant. *Presley v. United States*, 895 F.3d at 1289 (requiring persons asserting Fourth Amendment "demonstrate that their own privacy rights are at stake."). The undersigned does not make that assumption. To the contrary, the undersigned is not persuaded that Davis has carried his burden of showing he had a justifiable, reasonable, or a legitimate expectation of privacy that was invaded during the Google II search. *Gayden*, 977 F.3d at 1151.

The undersigned finds *United States v. Currie*, Case No.: 8:20-cr-262-PWG, 2022 WL 195504 (D. Md. Jan. 21, 2022) instructive.[17] The defendant in that case abducted his victim and took one of her two cell phones, which he kept on his person. Investigators obtained warrants for CSLI for both of the victim's phones and the phone owned by the defendant. When the defendant sought suppression of the CSLI data related to all three phones, the Government argued that he lacked standing as to the victim's phones because they were her property. *Currie*, 2022 WL 195504 at *2. The court looked to *Carpenter*, in which the Supreme Court held in that case that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI." *Carpenter*, 138 S. Ct. at 2217. The question in *Currie* that *Carpenter* did not answer was whether an "individual's reasonable expectation of privacy in the whole of his physical movements" extended to CSLI that is "generated by a cell phone that belongs to someone

---

[17] *Currie* is not binding on this court and is merely persuasive authority.

else." *Id*. at *4-5.  The *Currie* court read *Carpenter* to cover CSLI generated by another's device, resulting in suppression of the data generated by the defendant's phone and the victim's phone on his person.  *Id*. at *7.  However, the court denied suppression as to the phone the victim retained in her possession, reasoning that the phone "was not tracking [the defendant's] movements, it was tracking *his victim's*, and the fact that she and [the defendant] were in the same place for some of that time is of no object." *Id*. at 8 (emphasis added).

Here, Davis has not shown that he had a reasonable expectation of privacy in the Yonna Gmail account or device associated therewith that was searched.  Davis has not presented any evidence showing a connection to, association with, or possession of the Gmail account or device.  The device connected to the Yonna Gmail account was not chronicling Davis' movements, but the movements of some other person who possessed the device.  Indeed, the device was in the getaway car that Davis later entered. Davis has not produced any evidence showing he had a legitimate expectation of privacy in the Yonna Gmail account or the device used on January 23, 2020 that was associated with that account.  As in *Currie*, the fact that Davis later happened to be in the same vehicle as the device does not confer on him a reasonable expectation of privacy to assert a Fourth Amendment challenge. *Currie*, 2022 WL 195504, at *8 ("*Carpenter* is clear that it does not protect data revealing a person's location or movement at a particular point in time, but 'is about a detailed chronicle of a person's physical presence compiled every day, every moment, over several years.'  138 S. Ct. at 2220.").

In addition, the undersigned is not persuaded by Davis' argument that he need not have an expectation of privacy in the item seized – the Yonna Gmail account – but that a mere interest in the "area" to be searched is sufficient. (Doc. No. 116 at ¶ 2.) The "area" in this case was Google's storage of data within the Google II Warrant submitted by Faggart. Davis has failed to meet his affirmative burden of demonstrating that he had a legitimate expectation of privacy in the data that fell within the parameters of the Google II Warrant. Davis has not shown that any of his data was in the parameters of the Google II search. Nor has Davis shown that a device that was associated with his data was somehow searched or seized. Davis simply has not shown a legitimate expectation of privacy in the information seized by the Google II Warrant. Thus, Davis lacks "standing" to challenge the search and seizure in this case and suppression is not warranted.

Moreover, based on the circumstances of this case, the undersigned sees no need to journey into the quagmire of geofence search warrants because even if Davis had a legitimate expectation of privacy in the area searched pursuant to the Google II Warrant, the *Leon* good faith exception applies. *See Leon*, 468 U.S. at 913. "[T]he exclusionary rule does not apply when the police conduct a search in 'objectively reasonable reliance' on a warrant later held invalid." *Davis v. United States*, 564 U.S. 229, 239 (2011) (quoting *Leon*, 468 U.S. at 922). The good faith exception applies in all but four situations:

> (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role...; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where...

19

a warrant is so facially deficient [in describing the place to be searched]...
that the executing officers cannot reasonably presume it to be valid.

*United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002).  None of these situations

apply here.[18]  Even assuming arguendo that the Google II Warrant lacked particularity,

there is nothing in the record to suggest that Faggert's reliance on the warrant was

objectively unreasonable.  Because there is no law enforcement wrongdoing to deter,

suppression is not warranted.  *See Davis*, 564 U.S. at 236–38 (explaining that suppression

is a "last resort" to be used only when "the deterrence benefits of suppression ... outweigh

its heavy costs.").

Further, the application of the *Leon* good faith exception in this case is consistent

with *Chatrie*.  There, the court's *Leon* analysis considered the officer's consultation with

counsel, his past experience in seeking geofence warrants, and approval by a detached

magistrate.  *Chatrie*, 2022 WL 628905 at *28.  Each of these decisive factors are present

in this case and were noted by the Government during argument before the undersigned.

---

[18] The undersigned finds that Davis' argument that the warrant affidavit lacks indicia of probable cause is unavailing.  In *Martin,* the Eleventh Circuit indicated that, in order to determine whether an affidavit lacked sufficient indicia of probable cause, the court must look only at the face of the affidavit.  *See id.*  Here, the affidavit included: (1) statements pertaining to the geographic and timeline information that Google maintains for account users at a particular time; (2) facts relating to a Hobbs Act robbery and carjacking on January 23, 2020, and the escape routes from both crimes; and (3) Faggert's assertion that Google is likely in possession of information that could lead to the identification of the perpetrators if they were in possession of a cell phone with an Android operating system.  Based on these facts, the undersigned cannot conclude the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.  Therefore, contrary to Davis' argument, the third situation enumerated in *Leon* does not apply.

(Doc. No. 135, Tr. at 54.)   Courts consider "all of the circumstances" when evaluating whether a *Leon* exception applies and look to "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23.   In considering the circumstances in this case, the undersigned finds that the Government has shown that Faggert had no reason to believe that the Google II Warrant was invalid and has thus successfully demonstrated that the good faith exception is applicable here.

## IV.   CONCLUSION

For the reasons stated above, it is the RECOMMENDATION of the Magistrate Judge that Defendant's motion to suppress and supplemental motion (Docs. No. 110 and 132) be DENIED.   It is further

ORDERED that the parties shall file any objections to the said Recommendation not later than July 15, 2022.   Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.   Frivolous, conclusive or general objections will not be considered by the District Court.   The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file a written objection to the Magistrate Judge's findings and 28 U.S.C. § 636(b)(1) shall bar a *de novo* determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of a party to challenge on appeal the District Court's order based on unobjected-to-factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest

injustice.  11th Cir. R. 3-1; *Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 1st day of July, 2022.

JERUSHA T. ADAMS
UNITED STATES MAGISTRATE JUDGE